# Young v. Commonwealth.

(Decided June 7, 1938.)

ROSE & ROSE for appellant.

HUBERT MEREDITH, Attorney General, and WILLIAM F. NEILL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE BAIRD—Affirming.

Clarence Young was indicted in the Harlan circuit court on the 1st day of September, 1937, for the willful murder of George Pickard. On the 25th day of March,

1938, he was tried and convicted by a jury of the crime of manslaughter and his punishment fixed at confinement in the state reformatory for 21 years. From a judgment based upon that verdict he appeals.

He complains of the following alleged errors:

"First: Error of the court instructing the jury and failing to properly instruct them and in misinstructing them, and in failing to give the whole law on the case.

"Second: Error of the court in limiting the time of argument to twenty minutes on each time to which the defendant excepted at the time.

"Third: Error of the court in admission and rejection of evidence on the trial.

"Fourth: Because this judgment is flagrantly and palpably against the evidence and not supported by it. That verdict of jury was result of passion and prejudice."

It is insisted that as a matter of law, the evidence was not sufficient to authorize a submission of the case to the jury; and, that the court should have directed an acquittal at the conclusion of the evidence for the commonwealth. In reviewing the record, we are unable to find where counsel for appellant entered a motion for a peremptory instruction, and further note that counsel practically waives that alleged error and only suggests that the court should have given such an instruction. There is abundant proof to justify the court in overruling a motion for a peremptory instruction. It is confidently contended that the verdict was flagrantly and palpably against the evidence, and was not sufficient to support the verdict. A discussion of that alleged error necessitates a brief statement of the salient and material parts of the evidence.

The appellant, Clarence Young, was 24 years of age. George Pickard was 22 years of age. Pickard was killed on the 27th day of June, 1937, after 4 o'clock in the evening, in front of the pool room of Milford Napier, in or near the village of Cawood, Harlan county, Kentucky. He was killed by a pistol in the hands of Young. The killing occurred in the public highway just in front of the Napier pool room. John Mitchell and Ray Hall were both sitting by an open window in the pool room about 50 feet from where the killing oc-

curred. They heard no "racket" upon the outside, but did hear a pistol shot. They looked around at once through the open window and saw appellant shooting Pickard. He shot four or five times after they looked around. While the shooting was going on Pickard was staggering toward Young. Young pushed him off with his pistol and was striking him with his fists after he stopped shooting. These two witnesses at once left their place at the window and went out to where Pickard's body was lying in the road. They saw no weapon in his hands except Hall said he turned Pickard over because he was lying in the road on his face and when he did so he saw "brass knucks" in his watch pocket. He was the first person to reach his body. It was in evidence that Pickard was shot five times; one shot in the left arm, the arm was broken; another in the side about two inches below the armpit; another about an inch over the left nipple; another in the pit of the stomach and another a little lower than that. It is shown by several witnesses that the deceased had before the shooting occurred "brass knucks:" However, the testimony of several of the witnesses for the commonwealth is to the effect that the "brass knucks" were not in or on his hand during the shooting, but were after he was shot in his watch pocket. While Young was shooting Pickard, he was staggering toward Young, appearing to be trying to get hold of him or to strike him with his fists. There was evidence that soon after Young stopped shooting, he snapped his pistol once or twice at Pickard; then momentarily looked at the body of Pickard lying upon the ground; then traveled up the highway; some witnesses said he ran; others that he walked fast, but all said he went up the road and left the body of Pickard in the highway where he had shot him. There is no evidence of any previous trouble between the two men, except that on one occasion a witness for the appellant stated that probably two weeks before the trouble, he heard the deceased make a statement as Young passed them by, that he wanted to "whop that fellow;" that "he knew he could do it"; that he pulled something out of his pocket that "looked like brass knucks." This indicated that they were not the best of friends, but there is no evidence that they had ever had any previous trouble.

Appellant admitted the killing, but claimed that he did it in defense of his own person. He stated that he

was a miner by occupation; that on the 27th day of June, the day the trouble occurred, he in company with a friend, Lorene Bennett, came down from the drug store at Cawood, to the place where the trouble occurred. As he passed along the road, John Silver who was in Napier's pool room, came out upon the porch, called him and said: "I owe you a bottle of beer"; that his answer was that he did not; that about that time Pickard stepped out of the pool room onto the porch and said to him: "Yes, we do"; that his answer was: "For what do you owe me a bottle of beer?" and his answer was: "For beating H—— out of George Day". Young's answer was: "No, you got me wrong, I didn't have any trouble with George Day"; that Pickard then said: "Somebody told me you beat H—— out of him for beating Stanton". Then Young said: "You got me wrong"; and Pickard said: "George Day was trying to rob Sam Stanton." Young then said that he did not know anything about it, to "jump on him about it," and in answer to that, Pickard said: "I'm not afraid to". Young then said: "Tell him about it"; and he said: "I'm not afraid to"; "I'm not a bit afraid of no d—— son-of-a-b——." Then Young said Pickard looked at him and said: "You d—— son-of-a-b——, I'll kill you." And then pulled the "knucks out of his front pocket and struck at him"; that he (Pickard) then said: "You can't bluff me"; then Young said: "I raised and shot him four times". The question was then asked Young: "Why did you fire those last shots"? The answer was: "Because I knew he would kill me if I didn't." He said he fired two shots into the ground, first to stop him or bluff him; then he was asked and answered the following questions:

"Q. Why did you fire those two shots in the ground? A. To try to bluff him and see if he wouldn't stop.

"Q. About how many seconds, if you know, was it from the time you fired those first two shots in the ground to keep him from coming on you until you commenced shooting at him or shooting to keep him from killing you? A. I just had time to see what he was going to do. He just had time to say: 'You can't bluff me,' and I raised and shot him.

"Q. How long a time was there between the first two shots and the last four shots? A. About a second, I guess."

He stated that Pickard was advancing on him while he was shooting; that Pickard struck him with "knucks" and that he shot Pickard to stop him from killing him (Young); that after he shot the first two shots into the ground, Pickard came right on toward him; that he shot the four shots after shooting the two first shots to stop him from coming on him; that after shooting him he walked away. Lorene Bennett substantially corroborated the testimony of the defendant as to how the trouble occurred. A number of other witnesses, not necessary to be named, several of whom were 300 yards away, in effect corroborated the testimony of the defendant. The defendant admitted that he purchased at the drug store in Cawood the pistol that he shot Pickard with just about an hour before that time. It was a .32 special, holding six shells.

It is insisted that the evidence of the commonwealth and the defendant, considered together, showed that he was justified under his plea of self-defense, in shooting and killing the deceased. Counsel relies strongly and confidently on the recent case of Privitt v. Commonwealth, 271 Ky. 665, 113 S. W. (2d) 49, and insists that the facts in that case are on all fours with the facts in this case. In that conclusion, we differ. In the Privitt Case, there was practicaly no contradiction nor dispute as to how the killing occurred. In this case there is a sharp contradiction on material points, one of which is as to whether or not the deceased struck the appellant with "brass knucks", or whether he struck him only with his fists, or whether he struck him at all. In any event, the jury was not compelled to accept as true the statement of how the tragedy occurred as given by the appellant and his witnesses. It was in evidence that there were five shots in the body of the deceased, most of them deadly ones; one in the left arm, breaking it; one in the chest, one under the arm pit and two in the stomach. And further, from the testimony of the defendant, himself, there was enough to justify the jury in rendering the verdict they did, because the defendant stated that when the deceased told him: "You can't bluff me"; that he in a second of time thereafter shot Pickard at least four times as rapidly as he could. Witnesses differed as to whether the appellant shot twice in the ground, as he stated, or whether he shot in the ground at all. The pistol that he used could only fire six times and the evidence is conclusive that there

were five bullet holes in the front part of the body of the deceased.

On many material points the evidence is very conflicting. These questions are for the jury. This court will not reverse a judgment because the jury believed one set of witnesses as against another. Conners v. Commonwealth, 152 Ky. 57, 153 S. W. 16; Wilson v. Commonwealth, 140 Ky. 1, 130 S. W. 794.

It is a rule universally applied by this court that the jury are the judges of the credibility of the witnesses and of the value of the circumstances shown by the evidence, tending to establish the guilt of the defendant. This court will not set aside a verdict unless from all the evidence it is affirmatively made to appear that the verdict is so flagrantly against the evidence as to shock the conscience of the court, and to lead unerringly to the conclusion that the verdict was not authorized by the evidence, but was the result of passion and prejudice, and to let it stand would apparently be of great injustice to the accused. Roberson's New Kentucky Criminal Law & Procedure, 2nd Ed., p. 2107, section 1964; Mabry v. Commonwealth, 201 Ky. 599, 257 S. W. 1030.

After carefully reviewing the evidence in the case, we do not feel justified in saying that the verdict of the jury was so flagrantly against the evidence as to prejudice the substantial rights of the defendant. This court cannot and would not, if it could, invade the province of the jury, where there is a conflict of material facts, as appears here. The court will not say that the verdict was wrong or too excessive. The fact that the defendant secured a new pistol upon this day, just an hour before the killing, and shot the deceased at least five times, so soon after obtaining the pistol, and under the circumstances stated in the evidence, is somewhat significant. The conflict in the evidence as to whether the appellant was being assaulted by the deceased with a deadly weapon at the time of the shooting, and as to whether the "brass knucks" were found in the watch pocket of the deceased after his death, when his body was turned over, he having fallen upon his face, when no one else had reached the body except the witness who turned him over, and from the further fact that the shooting from the testimony of the defendant, was not altogether on account of apparent danger to the defendant at the time of the shooting, but was partly

based upon what the deceased said: "That he would not be bluffed", the jury had a right to conclude that the killing was not justified under the law of self defense. We see no real merit in that contention. The instructions given by the court, we have often approved. We find no error in them. The whole law was given aptly and clearly.

It is further insisted that the court committed a prejudicial error in fixing the time for argument of the case at 20 minutes. The record reveals that after the closing of the evidence and the giving of the instructions to the jury, the court enquired as to how much time was wanted to make the argument. The commonwealth's attorney said 15 minutes, which was objected to by counsel for the defendant. The court then fixed the time at 20 minutes. To that ruling, the defendant objected and excepted. It is shown, however, that counsel for the defendant was permitted to continue his argument for 25 minutes. The evidence in the case was very brief and simple. There were no complications. The facts as applicable to the issues joined were easily collated and the law easily applied. There was no particular reason for a long and lengthy argument. Lengthy arguments often do the defendant, in cases like this, more harm with the jury than good. The limiting of the argument is always in the sound discretion of the trial court and only when that discretion is abused will this court reverse a judgment. It does not in any way affirmatively appear that the discretion of the court has been abused to the prejudice of the accused. The trial court although after fixing the time at 20 minutes, permitted counsel for defendant to speak for 25 minutes, which was from the facts and issues involved an abundant time to present properly the defendant's case to the jury. This court in the case of Lucas v. Commonwealth, 149 Ky. 495, 149 S. W. 861, 42 L. R. A., N. S., 209, adhered to the rule stated below, that this court has continuously followed:

"In the more recent cases of Scott v. Commonwealth, 148 Ky. 80, 146 S. W. 406, and Stout v. Commonwealth, 148 Ky. 199, 146 S. W. 407, the rule announced in the Combs Case [Combs v. Commonwealth, 97 Ky. 24, 29 S. W. 734, 16 Ky. Law Rep. 699] was adhered to and reaffirmed, in the case of Stout, this court holding: 'We have ruled in a number of cases that the time that shall be al-

lowed for argument is a matter in the discretion of the trial judge, and that, unless it affirmatively appears that this discretion has been abused to the prejudice of the accused, it will not amount to a reversible error. * * * The trial court should, of course, allow counsel for the accused in every case reasonable time and opportunity to present the reasons why there should be an acquittal; but it is obvious that the time that should be allowed depends upon the facts and circumstances of each particular case. It is not to be altogether regulated by the number of witnesses that are introduced, as a very complicated state of facts might be presented by the testimony of a single witness. It is rather to be controlled by the simplicity of the facts and circumstances surrounding the transaction.' "

We are convinced that no prejudicial error was committed by the trial court in that respect.

Our attention is called to no error on account of incompetent evidence that the court permitted over the objections of the defendant to go to the jury. Therefore, we conclude that counsel waived that alleged error.

It is our conclusion that the judgment of the trial court should not be disturbed and that the substantial rights of the defendant have in no respect been prejudiced by the alleged errors relied upon.

Wherefore, the judgment is affirmed.